9th Circuit Court of Appeals Good afternoon and welcome to the 9th Circuit Court of Appeals. This is the time to set forth our argument in rehearing en banc of the case of the Geo Group and the United States v. Gavin Newsom and the State of California. If the parties are ready to proceed, you may begin. And as you come up, I understand you have decided to share your time, is that correct? All right. And so are you reserving time for rebuttal? Absolutely. Watch the clock. I'll help you. I'll try to help you, but you have the ultimate reason to help me. I would kind of like to save three minutes of my 18-foot rebuttal and put it on the Court's watch for the Honorable Clarence. And Mr. Kirk, who unfortunately can't be with us, but will be obviously participating, may please record our term for the United States. AB 32. Can you speak up as much as you can? Of course I can. Thank you. AB 32 prevents the United States from contracting for the operation with private contractors for facilities in which persons who are awaiting removal proceedings are held. The California Legislature, in enacting that provision, strongly condemned the use of those facilities. The question here, which is what we've tried to emphasize throughout, is not the virtues or the effects of the way in which ICE is implementing federal immigration laws. The question here is whether the United States can make the decisions about how it is going to implement the need. Mr. Stern, before we get into the nitty-gritty, if you will, of this, as you know, we're required to make certain that we have a justiciable controversy. As I've looked through the materials in the record, I don't see anything that makes it clear that the United States intends to extend the term of the contract into question. Are you authorized to make a statement to the court that we can rely upon concerning whether you intend to extend that term? I can tell. I haven't spoken to anyone about specific contracts. What I know is that ICE plans to continue to use privately operated detention facilities. It has a contract with Gino Group that expires in 2024, but it's subject to one and then a second renewal. I have no basis for believing that the contract won't be renewed. I think you know, of course, this is an injunction that you're seeking, a preliminary injunction. Usually when people seek preliminary injunctions, they're concerned about any immediate harm. In this case, you've got a contract that at the very least goes through, I think, December 19, 2024 before it's effective in any way, and it possibly goes through the same period in 2034. The government, based on what I've seen here, the executive order from the president indicates that the government does not, and I'm going to read this, intend to renew, in quotes, any contract with privately operated criminal detention facilities thereafter. So I'm sure we're going with this. You've got a preliminary injunction that you don't need until two and a half years from now or longer, and you have the president or the executive order saying that the federal government is not going to lease these kinds of facilities anymore. Is this the right contract? Is there a standing? We certainly think that there is at the district court, and the panel, both correctly, concluded that there was, to be clear about the executive order, it refers to criminal detention. This is not a criminal detention facility. But your statement is that what is mentioned in the executive order only pertains to criminal detention, right? That's correct. Okay. And although, like we're looking at a 2024 date, a 2024 date when you're talking about an operation on this scale, I think everyone has recognized that what would need to be done in order, if the United States really couldn't operate these facilities any longer in California, what would need to be done, I suppose, would have to be whatever. That's true. But it would change the fact that you still have to tell us whether you're going to do that. Because otherwise, what basis do we have for countenancing a preliminary injunction that you don't need right now? Robert, I'm sorry if I wasn't clear. I only want to say that I am not speaking to anyone about a specific contract, and therefore I didn't want to say anything about a specific contract. There is nothing happening right now to alter ICE's practice of ICE only operates facilities that it does not operate itself. It does not build facilities and operate them. And in California, one of the Geo Group and other private contractors, most of the only means in which these deputies are currently housed in California. So, counsel, can I ask you about the substance of your argument, which I think you're getting into on preemption, is your argument that if you had more time, presumably the federal government could operate because they were given 15 years, they could build enough facilities to handle the 7,000 beds, but they can't do it within two years. I think that's kind of the presumption, I don't think the finding was made. I think that what this preemption analysis hinges on is whether the federal government could still accomplish their rule of housing through an alternate means, or is your position, this is preempted by the simple fact that one of the arrows in our quiver has taken us to the latter, Your Honor. And the fact whether the federal government could do something in another way is not the issue. The federal government is vested with the responsibility and authority to make decisions about how to deal with aliens who are waiting. That can't be unfettered. The state has, I mean, so many regulations we apply where these facilities can be built. You can't have unfettered discretion on just housing them wherever you want to. So how do we get around that? The state has some ability to encroach on this. Where's the touch point to where it becomes an obstacle to preempt? Well, I don't think there's any question here that there's an obstacle. I mean, this is in large way an obstacle to preemption. There's no doubt that there would be another way. Because you can't do it privately. Because if the federal government could do it and house these detainees in their own facilities, and say they weren't using, there must be some states where they're not using private facilities, aren't there? I'm not sure whether there are any states in which there are no private facilities being used. It's set out, I'm sorry that I can't remember, but it's set out in the declarations that were submitted with this case. I'd like to just emphasize, we're not writing here on a clean slate. This goes back a really long way. And the Supreme Court has said, if you go back to Johnson v. Maryland, there we have, as in many other cases, statutes of general applicability. And that one just involved the question of whether the state could require a contract with the federal government to obtain the requisite licenses under state law. The Supreme Court says, absolutely not. You cannot do that. So are you saying that if you wanted to build a facility to house these detainees, and the state of California says that that facility must be a perfect proof, if you will, you're saying that that's preemptive, they can't do that? Is that what you're saying? Well, I don't want to take any positions. I want to answer the question, but I want to be clear. All that needs to be answered here is a very narrow, straightforward application of longstanding precedent. We're not here to make the law. We're here because this is an important question, and it's clearly covered by precedent. But to be clear, I mean, if we go back to the... Well, the application of that law would also embrace other statute. So we can't just pin it down to this particular fact pattern because our decision is broader than that. I understand that, Geronimo. I'm just saying that the decision can be written very narrowly. That's my only point, is we're not here, as the court, to say anything that hasn't been said by this court and by the Supreme Court. And if you look back to Steve Johnson and the cases that preceded, which he termed the Supreme Court's case in Osborne, and the court in that question goes, has anybody thought that it's a problem in contractors from providing materials or goods or services to a monetary base? And the court says we have not yet heard that answer in the affirmative. But forgive me, I don't mean to interrupt you too much on this, because I know lawyers like to have all the time they can. But I'd still have to get back to the original question, because before we decide preemption and other issues, I'm struggling with whether we have a case that's ripe here. You still haven't given me an answer, at least to my satisfaction, of why we should uphold a preliminary injunction, which will not, isn't needed, will not take effect for two and a half years at the least. I know you say that you may need some time to do something else. And if you said to me, Judge Smith, we're going to do this, I'm set. The judge told me that. I see nothing in the record that confirms that the government wants to do this. Judge Smith, we're going to do this. If in any one respect I'm wrong, I will let the court know immediately. But I was just trying to be, like, spur my statements in an abundance of caution there. Yes, we're going to do this. And, like, a preliminary injunction is needed, one, because it is simply that the statute is wrong as a matter of law. And, two, it is going to, in the very near future, and this is not something where we go, well, the preemption letter, you know, doesn't need to be prepared for a year and a half. What's the rush? Here, the rush is that if the United States, and there's nothing left, mind you, to be decided in a permanent injunction situation, I mean, this is it, right? So, like, if the United States either has to know that we need to seek further review from the Supreme Court, if that's what the solicitor general thinks is appropriate, or ICE would have to make alternative arrangements. Such as, for example, buying the facilities or leasing them themselves, right? Wouldn't that solve the problem? No, I don't think just leasing them would solve the problem. Are you saying that the state could somehow tell the federal government that it may not, as the United States, lease these very same facilities? I believe the way it is written is the point is that it's privately operated by a for-profit corporation. That's it. That's not how I read it. My understanding is there's nothing in any legislation from California that would stop or purport to stop the United States from leasing or buying these facilities and operating the same detention centers. Well, if the United States operated itself. Right. Yes, but that's the point, is the state of California cannot dictate to the United States how and who is going to run these detention centers. If this were a federal prison, we would know that the state couldn't say, oh, you have to do this, you have to do this, and it's no different. And the state could have made rules if it were about federal employees. It can't do it about contractors, and that's what all the cases, including sort of going back to Johnson and Osborne, and the court's decision in Gartrell, and all of these are statutes of general applicability that involve requirements that compared to this really are, like, you know, I want to sort of understate that the felonies are minimal in their impact compared to this. Those just have to do with getting a license. In this case, the federal government is being told, license, but there's a way to that. You can't do what it is you want to do. It's not just a question of getting a license. There is no case like this. No one in this hit-and-run litigation has ever identified a case that's remotely like this, and for very good reason. And this can work on people like the felon over the place. Different states have different policy preferences, and they can all decide under this reasoning that, well, you know, I don't like this particular thing. I'm going to place restrictions on the federal government's ability to contract with people in my state in order to accomplish it. Or, in this case, look, I don't want these people. You only house people in these kind of facilities. Fine, they'll go to another state. So what? So the United States is supposed to go to Arizona, and Arizona goes, what do you mean you're coming over here? Like, rather than pass a statute, then we wouldn't have, but we can't have the transferring of people to California. I think that gets back to my question, because it seems to me the federal government's interest here isn't detaining these individuals. It's not necessarily, they're not commanded to detain them in a private facility. They've chosen to. That's been an accepted practice for 40 years. But if the federal government can still detain them, why can't it still achieve its federal purpose in its own facilities? But that's not the test or preemption. The test is not whether you render. It's not a kind of impossibility preemption where you do it. Like, where the state procludes, and makes it impossible for the federal government to act. The question is, does it pose a burden? That's the question. I don't think that it does pose a burden. I think it is whether you can achieve the objective. You can run on it. I mean, if you relate me to a case that says it poses a burden, the federal government has an altitude to burden. They're placed upon it by the state. The question is, can you still achieve the federal objective? It seems to me. I mean, I prefer among the cases I would refer the court to are the Supreme Court's Crosby case, the permanent sanctions case. That was a case that involved Massachusetts spending its own money. And there was no direct conflict with any federal statute in that case. But the Supreme Court said, well, the federal scheme anticipates that the president needs to have flexibility to, like, be able to use a calendar as opposed to state. And the fact that Massachusetts has been tested, they've been substantially interceded with federal operations. Federal operations, you're trying to define it as federal operations as being able to use private contractors. Federal operations seems to be detaining the individuals. You're right. I mean, one could define what the federal government is doing. But the point is that the federal, let's say if the federal government is using some other form, right, of living in a situation and is using a particular means, and the state says, I don't like this particular means, and they're doing something from now on, like people might say, I can't work with you, and they say, do you want to use some other means? That's fine. And the federal government goes, well, wait a minute, there are 5,000 different reasons why I'm doing this and not the other one. And then the state goes, oh, but you're not being stopped from doing it. It's just going to be, like, something like that. The way you think it ought to be done. And there have been cases ever where it's like said, no, you cannot have the states doing that. And this is really sort of like this. I mean, this is just. Did you want to reserve a minute? I wish I could. You're down to four minutes. Okay. But I'll listen to you. But when you come back, if you could point to the language you brought, because you're reliant on it to say that the debt is burdened on the government. Okay. I'll try to do that. I'll try. I guess that would be what I'm going to tell you about. Tell me. I think you're muted, sir. We can't hear you. I apologize, Your Honor. Michael Kirk on behalf of GEO. Thank you, Your Honor. May it please the Court. Congress has granted the Secretary of Homeland Security broad authority to enter contracts that he determines are necessary and proper to carry out his responsibilities. That's 6 U.S.C. Section 112. And Congress has commanded the Secretary to arrange for appropriate places of detention. That's Section 1231. As the United States has pointed out on page 19 of its reply to me, each of the Homeland Security appropriation laws since the passage of AB 32 has included explicit language authorizing ICE to use private appropriated funds to contract for privately operated detention facilities. These provisions clearly and unmistakably convey Congressman's intention to grant the Secretary, acting through ICE, the discretion to use privately contracted facilities to the extent that he determines that that is appropriate. AB 32 directly conflicts with these provisions of federal law because it purports to deprive the Secretary of the discretion that Congress has granted to him. The state argues that Congress has not been specific enough in granting ICE authority to use private facilities. But the premise of this argument is wrong. Congress has specifically mentioned the use of private facilities, both in the appropriations bill and in 1996. Congress expressly recognized that INS was using privately contracted facilities when it directed INS to report on the number of criminal aliens released from such facilities. That's AUSD Section 1368. The state is also wrong to argue that the general grounds of authority to arrange for appropriate places of detention are not sufficient, neither the Supreme Court nor this Court has ever required such specificity. Indeed, in the United States v. California, this Court upheld application of California's AB 103 inspection regime only because, the Court said, and I'm quoting from 921 F. 30 AB 85, only because that state law does not regulate whether or where immigration detainees may be confined. That's exactly what AB 30 under that. Okay, so that regulates what? What if there were a zoning regulation? The federal government came in and said, we need this facility within a certain location in San Diego for whatever logistical reasons. But there was a zoning regulation, a state or local zoning regulation that prohibited that kind of facility to be built, whether it's by private facility, by private contractor or not. Would you be arguing that that's preempted under the same rationale that the discretion that's given to the Secretary is to decide where it wants to go, and he said he wants it right here, so therefore the zoning regulations are preempted? I think that's a tougher question, Your Honor, because obviously it leaves the federal government with still quite a bit of discretion. AB 32 is so far away from your hypothetical that whatever the answer to the zoning law is, it's different. I mean, the federal government said we want to do this, we have done this for 30 years, but it's not the only way to achieve its objective. It clearly can and does in certain circumstances. The federal government goes out and builds detention facilities. So why can't it do that here? It might be physically possible for it to do it here, but the Secretary has decided that that's not appropriate. And it's one thing to say the Secretary has decided it's appropriate to use private contractors and the state can't override that. It would be a much tougher question, I acknowledge, if all the state was saying is you can't build in Zone 3, you've got to build in Zone 4, or you have to earthquake-proof the building. Those clearly aren't as close to standing as the substantial obstacles carrying out of the government's operations. Counsel, following up on my colleague's question, the veracity or rather the sustainability of your argument depends on whether there is a presumption against preemption on traditional state police powers. Do you agree with that? I don't agree that my argument depends upon it. Even without the presumption, I think we win. But I do think the presumption does not apply here because while protection of health and safety generally is an historic police power, protecting the health and safety of people in federal custody, no state's ever done that. With respect, I wrote an opinion in 2019, which is called United States versus California, where Emily specifically held there was a historical precedent for the state of California to regulate the health and safety of penal institutions. I can give you the exact language if you want. I do recall it, Judge Smith. In that case, I believe the issue was not an issue. It was a slightly different issue, but we had that holding that this was a traditional state action, if you will, as part of the police power. And I think at least that portion of it applies here. Part of what I understand your argument to be is that basically police power doesn't matter. This is federal government. It can do whatever it wants. It preempts things. And as you seem to recognize, if you're talking about earthquake protection and other things that are traditional health and safety issues like zoning, there are some limitations on the power, and that's part of what we're struggling with here. Well, in answer to that, Your Honor, regardless of whether the presumption applies, the Supreme Court and this Court, in cases like Leslie Miller and Dutroux, have recognized that states, and again I'm quoting from your opinion, United States versus California, states may not prevent the federal government from entering into agreements with its chosen contractors until the state's own licensing standards were satisfied. Here they've not just said that we have to satisfy the licensing standards. They said that we can't enter contracts for this work at all. In page 885 of your opinion, Your Honor, you said that such a law would constitute, quote, active frustration of the federal government's ability to discharge its operations. Now it may be that an earthquake regulation or a zoning regulation would not rise to the level of frustrating the government's operations. Could a complete ban require the closing of all of the government's facilities in California? And, by the way, on your justiciability point, Your Honor, I would direct you to that specific record 220-221, where a declaration from the government indicated that they would need at least three years' leave time before they could build a new facility. So they can't wait until 2024 to get this resolved. Could I ask just a slightly different question? The Supreme Court today decided in Washington, D.C., that intergovernmental immunity case, apparently that doctrine is still good law as of this morning, which talks about the states don't have the authority to obstruct federal government's operations. Can you explain how is it all the intergovernmental immunity doctrine applies here? Certainly, Your Honor, and you're right to point to the Supreme Court's unanimous position this morning in the Washington case. On page five of the slip of the pen in that case, the Supreme Court specifically stated that intergovernmental immunity doctrine, beginning with McClellan v. Maryland, prohibits states from interfering with or controlling the operations of the federal government. That is precisely what AB 32 does. It attempts to interfere with the federal government's immigration detention operations by barring the use of private contractors. Similarly, this court in the Bowie case squarely held that where a state law purports to regulate, and I'm quoting 768-538-40, not only the federal contractor, but the effective terms of the federal contract itself. That's direct regulation, violation of intergovernmental immunity. It follows a fortiori. A state law does not simply attempt to regulate the terms of the federal government's contract, but completely prohibits it entirely. It's plainly unconstitutional. Counsel, it is. So did that case involve the federal government's historical constitutional immunity from state penetration and not application of police powers as a state-connected body? No, Your Honor. The Bowie case involved... I'm talking about the Washington case. Oh, yes. No, the Washington case was also a regulatory case, Your Honor. It involved rules for people at the Hanford nuclear site, state compensation rules, Washington. So it was specifically addressing states acting with the federal government. It was addressing the cost to the federal government or state workers' compensation. Yes, Your Honor. Mr. Kirk, our chief judge in her dissent on the initial opinion of this case said that even if the court agrees with your position on the laws as to the first winter factor, nevertheless, it should be remanded to the district court to consider the remaining factors because the district court had not passed on those factors. I want to get your response to the point that she made in her dissent. Thank you, Your Honor. We think a remand is not necessary for the other winter factors because the district court did walk through them in the context of the United States Marshals Service facilities where the court granted the preliminary injunction. The court found that the upcoming closure of these facilities was irreparable harm and that because we were likely to prevail on the merits, the constitutional harm was also irreparable, and the public interest favors following the Constitution. So I think based on the trial court's analysis of the other winter factors with the marshals, there's absolutely no difference between the marshals' facilities and the ICE facilities. Do you want to reserve? I mean, you've both gone well over the time that you wanted to say, but I think if you want to reserve any time at all for a vote, I'll amend it. Thank you very much, Your Honor. I will take that gentleman's offer. Okay. Thank you. Thank you. Chief Justice, again, may it please the Court, we, the federal counsel, and the state, the Federal 32, regulate private businesses that wish to operate a private detention facility within California borders. Well, counsel, that's not totally true. I mean, this regulates with the federal contracts of the federal government. And respectfully, Your Honor, Section 9501 is directed at private businesses in the operation of a private detention facility. Counsel, rather than banning private detention facilities, the state has set up a licensing scheme. In the interest of health and safety, you have to meet certain requirements to get a license, and then in order to continue the state's interest in maintaining health and safety, you have to keep up certain requirements in order to maintain that license. Would that pretty clearly be impermissible under Leslie Miller and the Public Utilities Commission cases? Your Honor, if there were specific federal regulations that spoke to the terms and conditions under which a private contractor could operate, then a state law that purported to conflict with or displace those regulations, that would be preempted under the holding in Leslie Miller in our trial, as Your Honor pointed out. So you're saying that the distinguishing factor is the set of procurement regulations in those cases that you're saying are absent in this particular case. That's the distinguishing factor? Your Honor, the distinguishing factor is that nowhere in the statutes that my friends have pointed to is there a clear and manifest consent by Congress to foreclose a regulation of private detention. I want to set that aside because I realize that post-North Dakota, it can be very confusing to try to figure out are we talking about intergovernmental immunity, are we talking about preemption and the presumption against preemption. So I want to set that aside and just ask you a factual question. If Leslie Miller and those procurement cases are still involved, so if the state had wanted to set up a licensing scheme, would that be permissible? Your Honor, with respect to if Your Honor, that intergovernmental immunity and that licensing scheme applied to private operators, the answer is yes, that would be permissible as long as it was not discriminatory because it's a federal government. The reason it would be permissible is that under North Dakota, as confirmed by the Supreme Court this morning in the United States v. Washington case, the test for whether a state law is a direct regulation of the federal government is whether the law regulates the federal government itself. And state laws that may have indirect consequences for the federal government by virtue of regulating private businesses. But Your Honor, we're talking about a private business that has no other business other than supporting the federal government. I mean, they don't do anything else. You might be right if you were a private contractor who had 100 clients and one of them is a governmental entity, but the whole purpose of these private companies is to take over a government responsibility. Your Honor, I don't think that's a distinction that matters here. The question is whether the state regulation is operating as to the private as opposed to the federal government itself. And that's because with respect to intergovernmental immunity, the state doesn't have authority to regulate government as such, but it has community authority to regulate private businesses that operate within their borders. And that's going to be consistent with Judge Smith's opinion from the excerpts that we just heard that he issued three years ago. Your Honor, I don't think that. I respectfully disagree with that. United States v. California, offered by Your Honor, did not address direct regulation. It was a case involving discrimination, and I would point the court to the Supreme Court's decision in North Dakota v. United States, Pat Berry v. North Control Commission, Railway Mail Association v. Horsey. All of those cases, it could be said that the state law, as it applied to a private entity interfered with the federal government's desire or plan to obtain services on the terms that the government wished. And in none of those cases would there, thousand, be a direct regulation of the federal government. In the case that we dealt with before involving California, what it boiled down to is that nobody ever thought that any state would ever do this, basically. So there was no regulation. So there was nothing that directly marred it. I think the state would agree that the federal government, either by regulation or statute, said no state may do X or Y. That controls, right? Your Honor, we do not concede that Congress has the power to confer a right on private companies to operate private detention services. But they have to be specific. And in this case, as I see it, one of the biggest challenges is you've got a situation here where the statutes that are cited by your friend on the other side are not very specific. They're very general. They have a lot of discretion. And part of it gets down to whether the standard required of the presumption or the presumption against preemption applies. It's got to be really, really clear. And I don't see that here. Do you agree with that? I do, Your Honor. Your Honor, I agree that nothing in the congressional enactments that my friend has pointed to reflects a clear and manifest intent by Congress to foreclose states from regulating private detention operations within their own borders. In the intergovernmental immunity area, which I'm still sort of interested in those terms, plurality in North Dakota, he says that the court has adopted a functional approach to claims of governmental immunity. So if we took a functional approach to this statute, AB 32, does that make a difference because the functional effect of this statute is to prevent the federal government to prevent the federal government from contracting with the federal contractors to run the private prisons? Your Honor, I respectfully disagree that the intent was specific to preventing the federal government. I don't care about the intent. I'm just saying the functional effect because that's what Justice Stevens said, at least in his plurality. Your Honor, it's correct that the court has adopted a functional approach, and I think that would lead the court to conclude there is no direct regulation here, and that's because the fundamental question, as it was discussed in North Dakota, is whether the law is operating on a private company or on the federal government itself, and the court is following the language that you're honoring. Do you think that's what functional effect means? The functional effect of something is who it operates on? Or is it the functional effect of cities alive? Your Honor, I think it's a functional approach in the sense that the court was not adopting a high – it was adopting a high bar to a claim of intergovernmental immunity because in the language that follows there, the court was clear that the purpose of the doctrine is to respect each sovereign's authority and that if there is a concern with one or the other sovereign overstepping their bounds, or in this case, the state overstepping its bounds or interfering with the federal government's practical operations in some sense, that's a question for comment. It's not a judicial question. So Stevens says the nondiscrimination rule finds its reason in the principle that the states may not directly obstruct the activities of the federal government. So this is true. It does not directly obstruct the activities of the federal government. Your Honor, it doesn't because these are not the activities of the federal government itself. These are the federal government's contracting with private contractors. It's not the activities of the federal government. Your Honor, the statute, AB 32, is not regulating the contract itself. I don't know why you stick with this argument. You've got so many better arguments. I mean, this doesn't even seem to be the realm of a real argument that this isn't a federal government function. Your Honor, we don't conceive that immigration detention is something that is within the jurisdiction and powers of the federal government, but there are different questions under the preemption doctrine and the intergovernmental immunity doctrine. And with respect to the intergovernmental immunity doctrine and direct regulation, that inquiry is centered on who is being regulated and not whether there are indirect agreements. But that's what I don't understand is how you can say the federal government is not being regulated here. Are there other cases where a government contractor is, that contracts solely with the government, with governmental entities is not subject to, that regulation of that would not impose intergovernmental immunity? Your Honor, in Penn Dairies v. Milk Control Commission, the state agency punished a milk supplier because of the term of one of its sales of a product to the federal government. The state there imposed a price regulation, informed the suppliers of the product, that it could have bid on federal government proposal in a way that conflicted with the state's regulation. In other words, the supplier couldn't offer or sell to the federal government milk at any price free from state constraint. And the court there held that that was not a direct regulation. We don't deny that in regard to that regulation of private companies, there can be indirect burdens on the federal government. But when the regulation is regulating the private entity and not the federal government, there is no direct regulation. Counselor, if I can go back to preemption, under conflict preemption, the key question is whether a state law poses as an obstacle to a federal objective. And if we look at the facts of this case, the United States government doesn't have any of its own facilities for detention in California. It relies exclusively or almost exclusively on private detention centers in California. So if we ban private detention centers in California, I don't see how this doesn't impede federal objective of detaining certain non-citizens. Your Honor, the reason that it doesn't is because the question is whether Congress clearly and manifestly intended for states not to have authority over private detention facility operations. And here my friends have pointed to a variety of statutes. In particular, 8 U.S.C. Section 1231G and 6 U.S.C. Section 112B. But neither of those reflects the clear and manifest intent of foreclosed state regulation. I mean, but the language is incredibly broad. I mean, does Congress have to – it seems like you're asking for a magic words theory of preemption, that they have to recite every single scenario. It uses incredibly broad language. It says any appropriate place of detention. It doesn't say appropriate governmental places. It says any appropriate detention places. And on top of that, Congress every year allocates money and explicitly mentions private detention centers. So I think it seems like the congressional intent is clear, unless you're asking for certain magic words that explicitly say that in the statute. Sorry, it's not a question of magic words, and I can address each of those provisions. But I'd like to begin by drawing a contrast between the provisions that Your Honor has pointed to and 18 U.S.C. Section 4013, which is the statute governing the marshal service, that the language in 18 U.S.C. Section 4013 tracks almost identically the language of 1103A11, which would be immigration. I mean, the marshal – sorry to interrupt, but the marshal statute doesn't have the broad language of any appropriate places of detention. While Congress did there, they explicitly said these are the places you can contract with states, interleases, or federal detention. That's one way of going at it. Another way is – and it doesn't mandate a point of – it doesn't say you have to enter into private leases or states because these are options. And another way Congress can achieve that same goal is use a broad term such as any appropriate places of detention. It seems that there are just two different ways Congress can go about the same goal. I respectfully disagree with that for two reasons. One is that the United States Department of Justice likewise has general authority that is of overt detention and contract in 18 U.S.C. Section 4001 and 28 U.S.C. Section 530C in the language. The second point is that the language in Section 1231G refers to, as Your Honor noted, appropriate places of detention. As the Fourth Circuit said in the Reina v. Haas decision, the statute essentially focused on the typical location or brick-and-mortar facility. We know that because the language of that entire provision is focused on the facility themselves. Also, can I pick up on Judge Lee's question and have you move away from preemption and maybe back into the intergovernmental immunity realm for a moment? Because as you discussed with Judge Lee, federal law does delegate to the agency the authority to determine the appropriate places of detention as well as the authority to enter into the appropriate contracts in order to effectuate that goal, right? Why don't that set of law and regulations operate in the same way as the procurement regulations in the cases that we discussed earlier, like the Miller and Public Utilities Commission? And if it does operate in a similar way, then those cases give me a sense of the proposition that the state can't give itself the power of review over federal contracting decisions. Isn't this then a power review over the decision by the federal government to use private contractors for these ICE detention facilities? It's not the difference between what the Miller, the Drell, and the Public Utilities Commission, in this case, lies in the specific language of the federal regulation or statute. That's my follow-up on Judge Lee's point. There are procurement regulations in those cases, but in this case, there's federal law delegating to the agency the discretion to select the appropriate places of detention and the power to enter into contracts to effectuate that goal. Your Honor, I don't think either of those provisions regarding the appropriate places of detention or a general contracting power speaks to the question of whether Congress clearly intended for ICE to contract the private detention facilities. I want to follow up on that because it seems like we've been saying the federal objective is just the operation of detention. If that's incomplete, any government function also has a price standard associated with it. So it's also in the background of doing things efficiently and cost-effectively, and we know from information in the record and how this has developed over time that why private facilities are being used is a cost measure. There's a judgment that the government has made that we do it this way because it's more cost-effective because things are transient in this aspect. Why is that not legitimate? I mean, it seems like the argument that you're making just completely ignores that. It's not just detaining people at any cost. It's doing it effectively and efficiently. Your Honor, of course, cost issues are legitimate matters of government concern, but ICE's practices in regard to how it evaluates those concerns does not have the ability to preempt state law. The only thing that can preempt state law in this context is an affirmative act by Congress that was discussed in Candidates v. Garcia that, judging by the text and structure of the law, expresses a clear and manifest intent by Congress to foreclose state regulation of these private facilities. But what we know is that Congress says we want you to do this task, and we want you to pick appropriate places to do it. So why does it need to outline all the details of that? It just says it's a broad, random authority, as Judge Lee's opinion describes. Why isn't that enough? I mean, I guess I'm back to basically asking the same question he's making of, well, first, did you need to be clear about, because this is not an area where states get to, and I think it's notable that both 31G lacks the language of continuous detention, 4013. It doesn't talk about private detention, private detention. Sure, that's important. I was struck, and it makes sense to me, by the fact that that language was included. Nobody disputes that under most statutes there is authority to contract with private detention facilities, and the language that this report picked up on, the U.S. Marshals Service doesn't require that to use private facilities, so I don't understand how these statutes were treated differently in that sense, because that language is different. Your Honor, I was referring to the language in Section 4013, the reason why it's relevant. It's because the statute specifically identifies private facilities as a method for housing federal U.S. Marshals inmates. It also talks specifically about the circumstances under which the U.S. Marshals can use private detention options. That language is notably missing from the immigration context. Have you disagreed that the immigration context gives the authority for the federal government to contract with private entities for a detention facility? Your Honor, we don't think that there's a clear and manifest intent in the statute to foreclose a regulation of private detention facilities. I don't understand why that language is different. If they have a discretion to exercise that authority in both cases, the federal government has that error when they're clever, and I don't understand why they could treat it any differently. Your Honor, I think the reason why they're different questions, if I'm understanding Your Honor's question, is because if the practices of ICE are lawful terms on different considerations, which is whether there are different standards, which is whether Congress expressly prohibited the practice, or whether ICE might be entitled to any form of deference with regard to how it's interpreting its authorizing statute. That's a different question than the one that's before the Court today, which is whether Congress conveyed its clear and manifest intent that states can't regulate in this area. To that point, as you know, your amicus counsel pointed out that at least with respect to the initial statute, it was decided by the government that there were no private prison facilities in the United States at that time. Does it matter that when Congress enacted that statute, they couldn't possibly have been thinking about private facilities in order to meet the clear and manifest standard that you referred to? Your Honor, I apologize for the question. Is the Court referring to 1231G or 1203? So I think that the import of that provision is that it is focused on facilities. It's not focused on detention services. It talks about the U.S. government employees, it talks about leasing, it talks about construction, and absent from that statute are language like care, housing, security, those words are in 4013 when Congress intended to speak to a detention servant as opposed to a physical place of detention. Counsel, if we were to rule in your favor, I just want to make sure I understand the scope of what we would be citing here. If we ruled in your favor in this case, would there be anything that could stop, let's say, the state of Arizona from saying, look, we're not like California. We don't want these people coming here. So in terms of private detention centers in our state, no air conditioning, no rec yard, we want this to be as miserable as possible. And we don't care what the federal government wants. That's how we want our private facilities here. If we ruled in your favor, what would stop Arizona from doing that? Your Honor, I think Arizona would likewise have similar authority to regulate private businesses operating within their borders. It is undisputed in this case that Congress would have the authority to take action to confer on private businesses the right to operate according to whatever specific standards Congress showed or adopted. But the problem with my friend's argument is that Congress just has not done that. Well, Congress doesn't have a great record on immigration. But I guess my question, though, is that your view is Arizona could do that. If you win this case, Arizona could do whatever it wants for private facilities. Your Honor, I don't know that whatever it wants is the position. What could it not do? Your Honor, there are obviously other forms of constraints on states arising from different provisions of the Constitution, like the Eighth Amendment and equal protection and things like that. But I think the point here is that Congress has not clearly and manifestly intended to strip states of their authority to regulate private businesses. So the answer to my question is that, yes, Arizona could do those things. Your Honor, I think there would very likely be other forms of concerns not tethered to the claim here, such as with the scope of the federal immigration statute. Every state that's in the Ninth Circuit could say no private detention facilities. The federal government cannot use any private detention facilities. Your Honor, the other states in the Ninth Circuit could, if it were to prevail, then, yes, they could adopt a statute similar to AB 32, which is regulating the private business. So, arguably, if other circuits agreed to this, this would mean that the states would decide that the federal government could not use private detention facilities for immigration detainees or for prisoners of any sort. So the 15 states could all decide that, and the federal government could not use it. Is that the import? Your Honor, the 15 states could decide to preclude the operation of private detention facilities, but what is always available to the federal government, if it concludes that states are acting in ways that interfere with important federal policy objectives, Congress undeniably has the power to preempt the regulation of private detention. So only preemption would work. The intergovernmental immunity is not effective. Your Honor, it would only be a problem under intergovernmental immunity in the scenario where the state is regulating the private system, if the states were not acting even haphazardly and treating similarly situated state-owned contract journalists as really similarly situated to the federal government, because only the federal government is running the detention centers, and that they're defined through the definition of detention center requires the government to be doing it. Obviously, the state can do what it wants. It's not regulating itself. It can decide how to treat its private detention facilities. Otherwise, the only entity regulated is the federal government, as I read this statute. Your Honor, I don't agree with that, and that's because Section 9501 applies to private businesses that wish to sell their services to local state or the federal government. And a premise of Your Honor's decision in the United States versus California was that immigration detention facilities were similarly situated to criminal detention facilities. And, of course, states operate those, and so the anti-discrimination principle would operate as a restraint on states. It's not hypothetical that Your Honor was raising. I see that I've consumed a couple moments of my colleague's time. We would ask the Court to affirm the judgment of the distribution. Thank you. Thank you. Good afternoon, Your Honors. Michael Coffman on behalf of the MIECHI, NIJC, and HCLU. Your Honors, I'd like to begin by addressing the primary authority of Palents in Vocare, Section 1231G8, the provision that provides ICE authority to arrange for appropriate places of detention. While it's no doubt true that appropriate, the term appropriate, can indicate discretion in certain circumstances, in other circumstances it can indicate the limitation. For example, if someone were to say, wear appropriate dress to the wedding, that surely doesn't mean you can wear whatever you want to the wedding. As the Supreme Court has instructed, that the term appropriate is inherently context-dependent. That comes from Sassabon v. Texas to the case from 2010. So your position is appropriate means things that are not prohibited by the state? No, Your Honor. I think if you look at the context of Section 1231G8, it's clear that appropriate detention facilities there are facilities operated by the federal government. If you look at the next sentence in 1231G8, it begins with the term, United States government facility. It refers to the fact that federal officers may be housed in the facility. You're only going to house federal immigration officials. So you're actually arguing they can't contract at all, they don't have the discretion, they don't have the authority under the statute to contract with private contractors? That's correct, Your Honor. That's our position. However, can anybody adopt, have any courts adopted that position? No court has adopted it. No court has rejected it, Your Honor. However, as my colleague indicated, to affirm KB 32 in this court, we only find that Congress did not give its clear and manifest intent to displace state regulation here. That doesn't, then, only apply if the presumption against preemption also applies? Absolutely, Your Honor, and for the reasons that you articulated, I think it's well-established from, Your Honor, the suit in U.S. v. California and the other authority cited by my colleague from California that the presumption shouldn't apply here. If I could follow up on that. If the presumption against preemption applies, can you still have conflict preemption? Yes, of course. Congress just has to speak clearly and manifestly. Isn't that part of the presumption against preemption? Just to assume, for the purpose of this question, that the presumption applies, can you still have preemption because of conflict preemption because it impedes a federal objective? Absolutely. Congress just has to speak clearly and manifestly to displace that. And it does so. I mean, I'm not sure what that has to do with conflict preemption, which is really a more practical look at does it impede a federal objective. So here, I mean, does it really matter? Again, we've talked about what an appropriate place of detention means and whether they should use different words. But just looking at the practical effect here, the statewide, it seems like based on the fact here, it impedes a federal objective of being able to detain immigrants in California because they will have no place to be placed in. So isn't that enough for conflict preemption? We're not talking about express preemption or just in terms of conflict preemption. We just look at it in a more practical way. It seems like California is impeding this important federal objective. A few responses, Your Honor. First, I think the presumption against preemption is part of the analysis of conflict preemption, so that's what I intended to address. But putting that aside here to address the issue Your Honor is raising about whether it impedes the federal government's operation, I'd just make a few points here. First, it hasn't been the case until recently that the federal government operated many facilities itself in California and across the country. There was a facility just down the road from here in San Pedro. It is the case today that the Customs and Border Protection, another agency within DHS that enforces the immigration laws, operates all of those facilities. And it experiences fluctuations in detention populations, just like it's been found in North Korea because they're operating on the border. And the last point about the cost of detention here, we noted in our brief that the contracts that ICE has with GEO has what are known as minimum bed guarantees, where the federal government pays GEO regardless of whether or not the beds are filled or not. So the issue that the federal government relied on about there being some concern that they would have to pay for empty federal beds exists whether or not the federal government is operating the facility or GEO is doing it. But to get back to the issue of statutory interpretation here, Your Honor, if I may, I realize our report passed the 30 minutes. Can we give you one more minute? Sure, Your Honor. Just to the extent that the term appropriate were ambiguous at all, I think that's a result by looking at the statutory context here of the INA as a whole. There is another provision that does authorize immigration authorities to contract other detention facilities, AUSC 1103A11. But that provision only authorizes contracts with state or locality, as my colleague indicated, in marked contrast with the marshals provision. If it were the case that the term appropriate in Section 1231G gave the DHS broad authority to contract with whomever they wanted, then there would be no reason for Congress to adopt Section 1103A11. It would be entirely superfluous. Well, I think that is because states are their own sovereigns, and the context of that was the whole issue of commandeering. There was a service in 1996 where the federal government could commandeer state officials to do this, and in 1997, Supreme Court said no, you're a state president. That seems to be context of can the federal government direct state presidents to hold, or states to hold detainees. It's quite different, I think, because you have to respect the sovereignty of the states. I think that's what that one's about. I don't know if I just have your indulgence as a response. I have one, just quickly. I just want to make that that's not an argument that either the United States or Congress would advance in their briefing. However, I think that can be reconciled with the terms of the statute. 1103A11 by its plain terms is 28 grand authorized, not some sort of limitation, and when Congress wanted to make clear that an agency's powers should not be interpreted in a way to infringe states' rights, it sets out far clearer terms. Another provision in the INA, also enacted as part of IHRA, gave the DHS Secretary of Authority to essentially deputize state and local officials to enforce immigration laws. These are what are known as 287G agreements. And directly after that provision, Congress wrote, this was at AUSC 1357G9, not even a subsection shall be construed to require any state or political subdivision of a state to enter into an agreement with the Attorney General under the subject. That, Your Honor, is what a reservation of states' rights looks like, and it makes clear that's what's going on in 1103A11 and something altogether different. Thank you. Thank you very much. Mr. Stern, I'm going to give you two complete minutes, and then I'm going to give Mr. Kirk one minute. Thank you very much. I appreciate it. I just wanted a couple quick points. One, I don't have the Crosby case with me, Your Honor, but I would point to the language of that outstanding as an obstacle to the accomplishment and execution of the full purpose. Excuse me. Could you argue that that is a verbatim clause? If it stands. I mean, I'm just relying on the Supreme Court's language, which has been applied by this Court many times. And, again, I think just looking at that case and what was going on there sort of helps to see why this one is so much clearer. I would like to say something about intergovernmental community, which I really didn't get a chance to talk about, but the only thing I'd like to really emphasize is intergovernmental community does not require a showing of discrimination. That's why the cases like Leslie Miller and Johnson and Bartrell all say there's no discrimination in any of those cases. That's sort of like sort of horrible thought going back for 200 years. Are you arguing discrimination here? Well, I believe the panel did. I couldn't really get to what happened. Maybe the panel sort of like parsed through all the reasons why this is discriminatory. The panel majority. I'm sorry. No, no, no. I'm trying to make a point because I don't know that the panel majority really wrestled with the substantial interference in the incidence test. I think it primarily relied on discrimination. So I just wanted to see what are you arguing here today? We are, I mean, you don't. I mean, there's clear as you don't. There's no, I mean, there's lots of, as we discussed, of reasons, but there's also no de minimis exception in these areas, and the burden is just on its face so much clearer than it is in the intergovernmental immunity cases that we cite. This one makes you like a great leap forward. I just sort of quote you in some discussion about the governor's decision when California gets in. I realize that this is big, but I'd like to summarize the point. Like from our point of view, very well. Because the question is in that case, which was an exception to the statutes, there's clearly a need to put federal governments behind it. You're right. You're right. You're tight, so just very quick. Okay, here's the rest of the quote. In the neglect case, it says, it's not very pleasant to be in the department of health, which prevents the federal government from entering into an agreement with its chosen contractors. In those cases, it states, I'm in frustration with the federal government's ability to respond to violations, and I think that's exactly what we have here.  Thank you. Mr. Kirk? Thank you, Your Honor. The case position on intergovernmental immunity depends upon the claim that AB 32 only regulates private parties. If you look at the text of the statute, it regulates private parties who enter into contracts with the federal government to operate private detention facilities. There is no difference between a law stating that the federal government may not contract with private parties to operate these facilities versus a law stating that private parties may not contract with the federal government. Whether worded one way or the other, the result is the same. Both contracting parties are effectively prohibited from contracting for the operation of private detention facilities, and that's direct regulation of the federal government. It is telling that California can cite no case in which a court has even permitted a state to regulate the content of a federal government contract, much less a case permitting the state to ban private entities from contracting with the federal government to provide services the federal government wants. And there's no stopping point to the state's theory. The state can impede the operations of the federal government by blocking private parties from entering contracts. It can also block them from serving as employees. Under California's theory, the state could block immigration detention altogether by prohibiting persons within the state from working at a private immigration facility. Any federal policy that a state disagrees with can be effectively blocked by prohibiting persons within the state from facilitating. That's it. I have no immunity. Over. Thank you. Thank you all very much for all of your informative presentations today. Very helpful and illuminating. The case of GEO in the United States versus the state of California is now submitted, and we are adjourned. Thank you. Thank you.
judges: MURGUIA, RAWLINSON, SMITH, IKUTA, NGUYEN, WATFORD, OWENS, NELSON, LEE, FORREST, SUNG